IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

---oOo---

BEFORE THE HONORABLE MORRISON C. ENGLAND, JR., JUDGE

---oOo---

DANIEL D. CLAXTON,

        Plaintiff,

vs.                     No. 2:08-cv-01058

COUNTY OF COLUSA, et al.,

        Defendants.

_____/

---oOo---

REPORTER'S TRANSCRIPT

HEARING

PETITION FOR WRIT OF MANDATE

THURSDAY, NOVEMBER 19, 2009

---oOo---

Reported by: DIANE J. SHEPARD, CSR 6331, RPR

DIANE J. SHEPARD, OFFICIAL COURT REPORTER, USDC -- (916) 554-7460

```
 1                        APPEARANCES

 2

 3

 4        For the Plaintiff:

 5

 6            McDONOUGH HOLLAND and ALLEN, PC
             BY:  KARA K. UEDA, Attorney at Law
 7                KIMBERLY HOOD, Attorney at Law
             500 Capitol Mall, 18th Floor
 8           Sacramento, California 95814

 9        For the Defendant:

10            WILLIAMS & ASSOCIATES
             BY:  MARTHA M. STRINGER
11           1250 Sutterville Road, Suite 290
             Sacramento, California 95822
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                      SACRAMENTO, CALIFORNIA

 2                   THURSDAY, NOVEMBER 19, 2009

 3                            ---oOo---

 4           THE CLERK:  Calling civil case 08-01058, Daniel

 5  Claxton v. Colusa County, et al.  On for Writ of Mandate, Your

 6  Honor.

 7           THE COURT:  Thank you.  Good morning.  May I have

 8  your appearances, please.

 9           MS. UEDA:  Good morning, Your Honor.  Kara Ueda for

10  the petitioner, Daniel Claxton.

11           MS. STRINGER:  And good morning, Your Honor.  Martha

12  Stringer for the County of Colusa and Stephen Hackney.

13           MS. HOOD:  Good morning, Your Honor.  Kimberly Hood

14  for the petitioner, and this is Mr. Claxton to my left.

15           THE COURT:  Thank you.  Before we get started, is

16  there anything that has changed since the moving papers have

17  been filed that I should be made aware of?

18           MS. UEDA:  No, Your Honor.

19           MS. STRINGER:  No, Your Honor.

20           THE COURT:  All right.  I understand the position of

21  the parties with respect to Mr. Claxton, and also I believe on

22  the part of the County, and the fact that you are looking for

23  an Administrative Writ of Mandamus, at least you are, to force

24  the County to permit the subdivision of the 421-plus-or-minus

25  acres of land into certain smaller parcels.
```

1          And just let me make sure that I have it correct as

2     far as the parcels.  They would be 39 smaller parcels.

3     Thirty-seven of them would be 10 acres in size.  And then there

4     would be two that would be 16 and 26 acres; is that correct?

5          MS. UEDA:  Yes, Your Honor.

6          THE COURT:  And currently the property is split into

7     some five 20-acre parcels and eight 40-acre parcels, which make

8     up the 420 roughly acres that we're speaking about.

9          Now as far as the County is concerned with respect to

10    the general plan that has been formulated, there is I guess a

11    presumption that you would say that any parcels that are in any

12    subdivision map application, which there is going to be five or

13    more parcels, and they are parcels which are less than 20 acres

14    in size, that those are going to be deemed non-agricultural.

15         MS. STRINGER:  Yes.

16         THE COURT:  And according to the information that

17    I've just gone over, there is a request that these parcels be

18    at 10 acres, so that would be in conflict with the plan.

19         MS. STRINGER:  Yes, Your Honor.

20         THE COURT:  And accordingly, if they are

21    non-agricultural parcels, that would be inconsistent with the

22    County general plan, and that is one of the reasons why the

23    County and through the planning commission, et cetera, voted to

24    deny the request for the subdivision because there was a

25    concern that this subdivision was not going to follow the

1       general plan, that is, to maintain agricultural purposes.

2              MS. STRINGER:  Yes.  In the future, yes.

3              MS. UEDA:  Your Honor, if I could interject just real

4       briefly.  The 20-acre minimum parcel size with the five parcels

5       or more issue, that's not actually contained in the general

6       plan.  That was adopted as a part of a resolution that was

7       enacted after Mr. Claxton submitted his application.

8              THE COURT:  Which I'm going to get to because this

9       all came about during the time period that a request had been

10      submitted.  That request was deemed to be incomplete.  And

11      during that period that it was deemed to be incomplete, this

12      came about.

13             MS. UEDA:  Yes, Your Honor.

14             THE COURT:  And as a result of this resolution,

15      07-010, the incomplete application then became an improper

16      application, if you will, because of this modification.

17             MS. UEDA:  After the application was deemed -- well,

18      before the application was deemed complete, yes, the County

19      adopted that resolution, which then made it pretty much in

20      conflict with the general plan or as not deeming Mr. Claxton's

21      application as consistent with the general plan as it could

22      have been or would have been had the County deemed application

23      complete 30 days after it was filed.

24             THE COURT:  Do you have an issue with the County in

25      that they passed this resolution while your client's

1       application was still pending or incomplete?

2              MS. UEDA:  Yes, Your Honor.  Because we do not

3       believe that the application was incomplete, and it was

4       actually complete when it was submitted.  Because when the

5       application was submitted, all of the different questions and

6       forms in the document were completed.

7              The issue that the County had with the application

8       was that there was a typographical error in the number of

9       parcels that was stated, and that differed from the map that

10      was shown.  And then the County also had some questions as to

11      what some of the terms in the application meant such as what

12      long-term estate planning meant.

13             And those reasons, we submit, are not sufficient to

14      actually find the application incomplete.  It might have

15      rendered some questions of the County, but the County had the

16      obligation, and it clearly had the discretion under the Permit

17      Streamlining Act to deem the application complete within the

18      30 days under the statute and ask these questions later.

19             THE COURT:  So it's kind of two things that we're

20      dealing with here.  One, there is the issue of whether or not

21      the application was complete or incomplete, but there's also

22      the secondary issue that I see, and that is whether or not the

23      County has the authority to issue a resolution in the middle of

24      an application process, which by the issuance of that

25      resolution would make the application not viable.

1              What about that issue?  Does the County have the

2     authority to issue a resolution to change certain dynamics that

3     would have the effect of making your client's application --

4     there is a word I'm trying to find here -- I can't get my arms

5     around it -- but that it wouldn't pass.  Can they do that,

6     first of all, or is that an exercise outside their discretion?

7              MS. UEDA:  Your Honor, I think the answer to your

8     question is two-fold.  I think as a very, very general matter

9     the County has the discretion to interpret its governing

10    documents, so it has the discretion to interpret its general

11    plan and its zoning ordinance.  However, it didn't have the

12    ability in this instance to adopt this particular resolution

13    because what the County effectively did was to amend its

14    general plan.

15             The general plan on the date that Mr. Claxton

16    submitted his application clearly permitted 10-acre parcels,

17    and it clearly permitted the application that was submitted.

18    Mr. Claxton's application did not seek to actually amend the

19    general plan or the zoning code.

20             The general plan said that 10-acre non-agricultural

21    parcels should be prohibited, but Mr. Claxton did not propose

22    any 10-acre non-agricultural parcels.  And so what the

23    resolution effectively did was to amend the general plan to say

24    that any subdivision of five parcels or more that would result

25    in 20-acre parcels or fewer -- 20-acre or fewer parcels would

1    automatically be deemed to be non-agricultural.  And that's a

2    fundamental rewrite of the general plan, which the County was

3    not permitted to do because the County did not follow the

4    proper procedures for amending its general plan.

5              THE COURT:  So in essence, they have the authority,

6    but they were improper in what they had actually done.  That's

7    your position.

8              MS. UEDA:  Our position is that they have the

9    authority up to a point to interpret the general plan, but

10   really what they did in this instance was to rewrite it or to

11   amend it, and to make the application -- or to make its general

12   plan -- excuse me -- to amend their general plan in a manner

13   that deemed -- they could more easily deem the application

14   inconsistent with the general plan, and that in and of itself

15   is not permitted.

16             THE COURT:  So from the County's perspective, in

17   essence what they did is it looks like they modified the

18   general plan to make the Claxton Rule.

19             MS. UEDA:  That's right, Your Honor.

20             THE COURT:  How did this come about?

21             I understand that the County can modify its plan, can

22   do certain things.  But timing is everything, as they say, and

23   here's a situation where you have an application that is

24   pending, and there is a lot of discussion about that particular

25   application, about what maybe prior uses have been, whether or

1    not they've been truly agricultural, what it would do to the

2    particular area.  There is a modification which, in effect,

3    changes the general plan of the County.  And it appears that

4    it's directed toward one application, one person.  It looks

5    that way.

6             MS. STRINGER:  It looks that way because of the way

7    the brief is written, but it's taken in a vacuum.  There were a

8    lot of applications going on at various times.

9             When we refer to the record, we looked at several

10   people, Lauer -- I can't pronounce that name -- there were

11   references in the record to a number of applications that had

12   been coming in around this time, and the County was having a

13   hard time determining what to do with these many that were

14   coming in.  And Mr. Claxton's happened to be the largest.  His

15   was the biggest split.

16            What the County did in the resolution was probably

17   something they may or may not have had to do to deny his

18   application, if that was what they were going to do.  The

19   general plan was very clear in its intent on preserving the

20   rural nature of a lot of the land in Colusa County, and it was

21   somewhat ambiguous as to what is a non-agricultural parcel.

22            The resolution was put in to clarify that.  It is not

23   a modification of the general plan.  It is a definition.

24            And I looked last night at a case that the plaintiff

25   cited for a different proposition, which is Witt Home Ranch

1    versus County of Sonoma, 2008 case, 165 Cal.App. 4th 543, where

2    almost the exactly the same thing happened.  The board of

3    supervisors enacted a resolution which was intended to provide

4    guidance to the staff of the -- would be the Sonoma County

5    Permit and Resources Management Department because the Witt

6    Home Ranch was working on a subdivision map from 1915, and

7    wanted a certificate of compliance.

8           And so the board took a look at all the regulations

9    from, I think, 1893 to 1929, and made a determination that maps

10   that had been finalized after 1929 would be deemed compliant

11   and would get a certificate of compliance, and maps before that

12   date would not.  And so Witt Home Ranch wasn't going to get its

13   certificate of compliance.  It was a de facto resolution.

14          The court said that was fine.  Said that local

15   governing boards -- and I'm quoting -- are called upon to make

16   interpretive decisions that will affect future applicants

17   similarly situated to the one under consideration.

18          So that is what the Colusa board did in Resolution

19   0701.

20          THE COURT:  Weren't there other applications that

21   went through where there were less than 20 acres that were

22   approved during this time period as well?

23          MS. STRINGER:  They were done by what is called a

24   parcel map, which Mr. Claxton could have done, and he could

25   have made four 10-acre parcels and a much larger remainder.  He

DIANE J. SHEPARD, OFFICIAL COURT REPORTER, USDC -- (916) 554-7460

1    could have done that, but he didn't want to do that.  He wanted

2    his 37 10-acre lots.

3            And the issue isn't so much what Mr. Claxton was

4    going to do, it's the planning commission and the board of

5    supervisors are looking at long-term.  The general plan looks

6    at long-term.  They were seeing what was happening to these

7    subdivisions that were turning into ranchettes when they were

8    10 acres.

9            And people would come in.  They put up a house.  The

10   orchard would be there, but it was too expensive to operate, so

11   the trees died, pests came in, trees were cut down, and they

12   didn't operate the orchard.  And it turned into a little

13   residential home site.

14           And Mr. Claxton makes a big issue of his not asking

15   for a zoning change.  Well, you can let your orchard die.  You

16   can let your trees become infested with parasites, and you cut

17   them down without violating zoning.  So effectively what would

18   happen, say, to his land -- because he had no way to stop

19   future purchasers -- even purchasers directly from him -- from

20   maintaining the land in agriculture.

21           THE COURT:  But just looking at this from another

22   angle.  And I understand the County's position of wanting to

23   maintain a particular use - farming.  And I understand that

24   zoning is one thing.  And if it's zoned agricultural, and like

25   you said you could let everything just go to pot, if you want

1    to, just let it all die out.

2        Isn't another way of looking at this is to beef up

3    your zoning ordinances and require that there be some

4    methodology for enforcing the current zoning ordinances that

5    are on the books, so that if someone were to purchase the land

6    at 10 acres, and it's agricultural, that they be required to

7    maintain certain levels.

8        MS. STRINGER:  I don't know, Your Honor.

9        THE COURT:  As opposed to saying anything that's 20

10   acres or less is just automatically non-agricultural.  That's

11   where I'm trying to get to the point where you can say that if

12   it's 20 acres or less, and if you have five or more of them,

13   that just ipso facto it's not agricultural, period.

14       MS. STRINGER:  But that's exactly what a county can

15   do in its general plan.  If that language had been as explicit

16   as that in the general plan, that would have been permissible.

17       THE COURT:  If it had been, correct.

18       MS. STRINGER:  A county can do that.

19       So that's what the intent of the general plan was,

20   and that is what this resolution was intended to do because

21   there was no definition of what is non-agricultural land.

22       THE COURT:  So the resolution was intended to then

23   modify the general plan?

24       MS. STRINGER:  No.  It was not intended to modify it.

25   It was intended to interpret it.  What do we, the County, mean

1    by non-agricultural land when considered with the intent of

2    preserving the agricultural land in Colusa County.  Because if

3    you put this land into 10-acre parcels, you're going to end up

4    with non-agricultural land.  You can see it.  You can see

5    what's happening as you go up Highway 5 or Highway 99.  That's

6    exactly what is happening.

7              THE COURT:  Response?

8              MS. UEDA:  Your Honor, I would point the Court to the

9    general plan language and the zoning ordinance itself.  The

10   general plan states under the agricultural general section,

11   which is in the record at page 503, that the agricultural

12   general areas are presently zoned exclusive agriculture and are

13   subject to a 10-acre minimum lot size requirement.

14             The general plan does contain a warning, as the

15   County said, that subdivision of farms into 10-acre

16   non-agricultural parcels should be strictly prohibited.  Then

17   the zoning code has similar language in it concerning 10-acre

18   minimums.

19             If the County had wanted to do something to prohibit

20   10-acre minimum lots or to prohibit -- or to allow 20-acre

21   minimum lots, it could have done so.  And it could have done so

22   by amending the general plan and following the procedures that

23   are set forth in state law.  It did not do so.

24             It saw Mr. Claxton's application.  The County sent

25   Mr. Claxton a letter telling him that the board of supervisors

1   was going to use his application as a point of discussion to

2   consider this resolution.  When the board of supervisors

3   decided not to adopt that resolution on the given day within

4   the 30-day time period that it had to deem his application

5   complete, instead deemed his application incomplete, later

6   adopted the resolution, and then took its time to find the

7   application complete after all when really nothing had changed

8   between the two dates.

9        The County had the ability to amend its general plan

10  and did not, and we cited to evidence in the record that the

11  County actually considered doing something with the 10-acre

12  minimums and declined to do that.  And so it had the

13  opportunity and the chance, but it could not have modified its

14  general plan in this manner by adopting that particular

15  resolution.

16       THE COURT:  So the issue that they are raising is

17  that modification of a general plan is totally within their

18  discretion, but it's the way that it went about it, kind of a

19  back-door way to do it.

20       But what I think is interesting is that it's done by

21  the County through the planning commission.  An application is

22  submitted.  It's deemed to be incomplete.  Whether it was or

23  not, debatable.  But it's interesting, again, that during that

24  incomplete process a new ordinance is passed or a new -- not an

25  ordinance -- but a resolution is passed while it's incomplete

1      that is meant to affect that particular application, but yet

2      you're saying that it's really for the whole general plan.

3             Yes, I can see where you are saying that it does, but

4      I can also see the other side.  It looks like if you are the

5      one that controls the application process, you can deem

6      anything incomplete, and that gives you an opportunity to go

7      ahead and do whatever you want to do to change it in the middle

8      of the process.

9             MS. STRINGER:  Well, it's hard to say that it wasn't

10     incomplete.  They make a rather large issue of there was a typo

11     so that the amount -- or number of lots on the application was

12     different from what was shown on the map.

13            Well, we're talking here about an issue of number of

14     lots, so that was a rather large problem with the application.

15     There were other problems with the application such as what is

16     long-term planning.  Mr. Claxton has admitted -- even though he

17     says I was going to keep this acreage in agricultural

18     long-term, he also admitted if he had a financial need, he was

19     going to sell off these lots.  And 10-acre lots he said were

20     easier to get financing on than larger lots, and that's because

21     one can build many more houses on a larger number of lots.

22            So it was obvious that what he was saying was

23     conflicted.  And long-term estate planning, the way he ended up

24     defining it, which was not really much of a clarification, but

25     it means we're going to sell this land off.

1          THE COURT:  How is that an incomplete application?

2          MS. STRINGER:  Because it didn't explain what he was

3     going to do.  He was applying to subdivide his land.  The

4     County is entitled to know the answer to certain questions

5     before they consider his application complete.  And they went

6     back and forth, back and forth, and finally said, you know,

7     we're getting all we can get from him, so we'll just deem it

8     complete.

9          And that happened four -- I think four months after

10    this resolution passed.  So if the intent was to deal with

11    Mr. Claxton's land, the application would have been deemed

12    complete and denied well before it was denied.

13         It was intended to affect everyone.  And Mr. Claxton

14    has admitted, and I believe I cited to it, but he said this

15    resolution will apply to me and to all subdivisions such as

16    mine.  So they were not singling out him or his land.

17         MS. UEDA:  Your Honor, I have just a couple of points

18    in response to that.  Going back to the issue of the general

19    plan.  It's not merely an issue of interpretation.  It's not

20    merely an issue of an amendment or modification that didn't

21    follow the process.

22         The fundamental point of the resolution was to adopt

23    a resolution that would bind Mr. Claxton's application and

24    would effectively prohibit his application from moving forward

25    because it would give the County a reason to deny it other than

1          these sort of hypothetical and fanciful reasons that the County

2          can think of that might happen if the parcels were divided into

3          10-acre lots.

4                    The resolution conflicted with the general plan, and

5          the County could not by resolution, by this particular

6          resolution, adopt the resolution that would actually be in

7          conflict with this general plan.  It's one thing to interpret

8          it.  It's another thing to actually fundamentally change the

9          language.

10                    And one of the things that County has mentioned is

11         that if the land was divided up into 10-acre parcels, there is

12         no guaranty that the orchard would continue to flourish, that

13         the land would continue to be used for agricultural.

14                    Your Honor, there is no such guaranty for any

15         property.  There is no guaranty that if a person puts up a

16         single-family home, that they will keep it up and maintain it.

17         There is no guaranty that anything will continue to be in its

18         existing use.

19                    However, what's important to realize here is that

20         what Mr. Claxton proposed was a subdivision of his land.  He

21         was not proposing to change the use.  He was not proposing to

22         change the zoning or the general plan.  He wasn't proposing to

23         put up a subdivision or anything even remotely looking like a

24         subdivision.  It was just a subdivision of land into new, legal

25         lots.  And it didn't do anything to actually change the use.

1              The findings that the County came up with to deny his

2       application were all based on hypothetical situations that were

3       the County's worst fears about what could happen to the land.

4       And the County's findings expressly state that, that these

5       things could happen, and that they might happen when there was

6       no use or proposed use for that land.

7              And getting back to the issue of the application,

8       sure, the County was entitled to know how Mr. Claxton was going

9       to use this land, but that doesn't deem the application

10      incomplete.  The Permit Streamlining Act specifically permits

11      the County to deem the application complete and later go back

12      and ask him questions.  Those were all clarifying questions.

13      They weren't completeness questions.  I mean, to me,

14      completeness means that something has been filled out in its

15      entirety, and there is nothing missing.  And if there are

16      clarifying questions, that's a completely different subject.

17             THE COURT:  Or the application can be complete, but

18      if you don't like the answers, it's still a complete

19      application, isn't it?

20             MS. STRINGER:  No, Your Honor, not necessarily.

21             THE COURT:  If all I have to say is I intend to

22      continue to use the land in its intended, zoned purpose,

23      agricultural.  That's all have I to say.  Isn't that sufficient

24      to get me beyond any incompleteness argument?

25             MS. STRINGER:  Well, he added a lot more to it.

1          THE COURT:  Because the County said you have to give

2     us more.  But from just a general standpoint, if one were to

3     take out the application, look at it, fill out all of the

4     requested information and simply say the intended use will

5     continue to be agricultural, period.

6          MS. STRINGER:  Perhaps --

7          THE COURT:  Isn't that complete technically?

8          MS. STRINGER:  Perhaps for that particular question,

9     but there were other questions.  We keep forgetting about the

10    size, the number of lots.

11         But it was also -- a lot goes back to what the County

12    knew.  And it also knew that Mr. Claxton had previously

13    subdivided lots, sold them off, and some of those lots were no

14    longer in agriculture.

15         And what the County is supposed to do is look into

16    the future.  No, there's no guaranty that any particular land

17    is going to be in agricultural forever.  And I don't know if

18    200 years from now we're going to look up Highway 5 and all

19    we're going to see is houses.  I don't know.  But a County is

20    entitled to create a general plan with an intent to do what

21    it's going to do for the next 10 years, 20 years, whatever the

22    length of the general plan is, and maximize the opportunity

23    that this general plan will carry out the intent that is

24    expressed in it.

25         And in Colusa's general plan it is expressed over and

1    over again that agriculture is essential.  It's the lifeblood

2    of the County, and it's to be protected.  And so the uses that

3    could be foreseen, they aren't just pie in the sky.  It was

4    happening.  And I believe the citations to the record show that

5    the county residents came and said, look what's happening,

6    we're living here, we see it.  It's going on in front of our

7    eyes.  And the County is allowed to maximize the opportunity

8    that it has to say, let's see if we can't prevent this, and

9    here's how we're going to do it.

10         THE COURT:  You are asking from the plaintiff's

11   standpoint for a Writ of Mandamus.  In so doing, the Court has

12   to consider whether or not the respondent acted in exercise of

13   its jurisdiction, whether there was a fair trial, and whether

14   or not there was a prejudicial abuse of discretion.

15         Address each of those items because that's what you

16   are going to have to show here.  First of all, did the

17   respondent act in exercise of its jurisdiction?  Are they not

18   permitted to formulate a resolution?  That in and of itself,

19   just the act of formulating a resolution, is that an act

20   outside of their jurisdiction?

21         MS. UEDA:  Your Honor, the County acted in excess of

22   its jurisdiction in this instance because what it did was it

23   amended its general plan in a manner that conflicted with the

24   general plan.

25         And so if the question is whether they have the

1    authority to adopt any resolution, the answer would be, yes,

2    they clearly have the authority to adopt a resolution.  But

3    they didn't have the authority in this instance, and they

4    exceeded their discretion and their jurisdiction in adopting

5    this particular resolution, which was -- which was really aimed

6    at Mr. Claxton.  I think the record makes clear that it was.

7            But that wasn't the fundamental reason why the County

8    exceeded its jurisdiction.  The reason is because the

9    resolution actually conflicts with the general plan and is more

10   restrictive than the general plan, and they didn't follow the

11   right procedures.  There is a reason why state law requires a

12   general plan to have certain processes including notice and a

13   public hearing, planning commission meetings, and a board of

14   supervisors hearing.

15           The only thing that happened in this particular

16   instance was the board of supervisor's hearing.  None of those

17   other steps actually occurred.

18           THE COURT:  Did you say earlier, counsel, that there

19   had been full compliance with all of the requirements for

20   modification of a general plan?  Did I misunderstand you?

21           MS. STRINGER:  Yes.  No, I did not say that.

22           THE COURT:  So do you concede that there was not the

23   appropriate steps taken if one were to try to modify a general

24   plan?

25           MS. STRINGER:  If one were to try amend a general

DIANE J. SHEPARD, OFFICIAL COURT REPORTER, USDC -- (916) 554-7460

1       plan, then they did not take those steps.

2              THE COURT:  Okay.

3              MS. STRINGER:  But this is not an amendment.

4              THE COURT:  So we don't have an argument that there

5       is a specific procedure for amending or modifying a general

6       plan.  So it is your position that the resolution 07 --

7              MS. STRINGER:  010.

8              THE COURT:  -- 07-010 did not modify the general

9       plan, so therefore the requirements under the state law for

10      modification of a general plan never came into play.

11             MS. STRINGER:  Correct.  It's our position that that

12      resolution was an interpretation that was consistent with the

13      general plan, not a modification of it, or an amendment of it.

14             THE COURT:  But if you look at that plan, it says

15      that agricultural general areas are presently zoned, quote,

16      exclusive agricultural, end quote, and are subject to a 10-acre

17      minimum lot size requirement.

18             My reading through here, I don't see anywhere where

19      it says anything about less than 20 or five or more.  It simply

20      refers to 10-acre minimums.

21             MS. STRINGER:  Well, the next page says, in some AG

22      areas it may be appropriate to raise the minimum parcel size

23      requirement from 10 acres to 20 or 40 acres.

24             THE COURT:  That's permissive.  In some cases it may

25      be permitted.  In the resolution it says specifically if it's

1     five or more with less than 20 acres in size, it shall be

2     deemed non-agricultural, period.  That's not permissive.

3     That's mandatory.  So that language then from a permissive

4     language in a general plan to now very specific directing

5     language in a resolution, you don't believe that that modifies

6     the general plan?

7              MS. STRINGER:  I don't because if you go back to page

8     503, and then you go into that last paragraph more, that's

9     where the ambiguity that the resolution was intended to deal

10    with came from.  It said, 10-acre county home sites are highly

11    marketable in Colusa County, particularly in orchard areas

12    where foliage is dense.  In addition to the minimum lot size

13    requirement, it is imperative that the zoning ordinance

14    specifies agriculture as the primary use of these properties.

15    Subdivision of farms into 10-acre non-agricultural parcels

16    should be strictly prohibited.

17             So what is a -- in 1989, when this was enacted, they

18    didn't bother to go into any further explanation of what this

19    meant.  But what was a non-agricultural parcel over the ensuing

20    20 years, 18 years?  It had become obvious that these 10-acre

21    parcels were becoming non-agricultural de facto, and that's

22    what the County was trying to deal with.

23             And while they could have amended the general plan,

24    there was no requirement that they do so.  There is a new

25    general plan that's due this year, and I don't know what will

1    be in it.  But because of this ambiguity and the intent that

2    can be read into it, because it says lot size requirement alone

3    is not enough to prevent the conversion of agricultural land

4    from farming to low density residential use.

5              THE COURT:  I'm reading it, and I understand that.

6    But it simply says, it is imperative that the zoning ordinance

7    specifies agriculture as the primary use of these properties.

8    Subdivision of farms into 10-acre non-agricultural parcels

9    should be strictly prohibited.  "Should be."  And then it says

10   "non-agricultural parcels."

11             That is different than saying if you have five or

12   more parcels with less than 20, we're deeming them

13   non-agricultural.  That seems to be totally different from the

14   way this was read originally, the general plan, when you're

15   talking about 10-acre minimum sizes that must be agricultural.

16   And then it says, and we believe it's imperative that of those

17   10-acre parcels, they should not be non-agricultural.  That's

18   what they are referring to if you look at the general plan.

19             But by changing it into five or more of 20 acres in

20   size are deemed non-agricultural, that seems like a very direct

21   modification to a general plan.  Much more so than just simply

22   clarifying language.

23             MS. STRINGER:  Well, Your Honor, I think if you look

24   at the Witt case, you will see that something very similar

25   happened there when they were looking at these regulations for

DIANE J. SHEPARD, OFFICIAL COURT REPORTER, USDC -- (916) 554-7460

1    years early in the last century and just saying we are

2    determining that anything before 1929 is going to be

3    non-compliant, and you're not going to get a certificate of

4    compliance.  Even though the ranch had argued back in 1915 we

5    were compliant.  We just haven't done anything with this land

6    for 75 years.

7              THE COURT:  Was there a fair trial?

8              MS. UEDA:  No, Your Honor.

9              THE COURT:  Opportunity to be heard?

10             MS. UEDA:  No, Your Honor.  There was not a fair

11   trial.  And I would refer the Court back to the two cases that

12   we cited in our briefs, the Arnel case and the Clark case,

13   which the County did not try to distinguish in its papers.

14             Both of those cases dealt with discriminatory

15   treatment of an applicant and stand for the proposition that

16   while a public agency has some discretion to deny or to approve

17   an application, it doesn't have the ability or the right to

18   treat an applicant in a manner that is discriminatory, which is

19   exactly what the County did here.

20             Going back real briefly on the Witt Home Ranch case,

21   Your Honor, that case, I believe, dealt with antiquated

22   subdivisions, and it really isn't a case that is similar to

23   this case where the issue in our case is clearly what does the

24   general plan language say, and what does the resolution say,

25   and did the resolution conflict with or effectively amend the

1    general plan without following the proper procedures.

2              MS. STRINGER:  And, Your Honor, the Clark case -- one

3    can distinguish any case -- but if you want to distinguish the

4    Clark case, it's a large distinction because in Clark the

5    Clarks didn't get a fair trial because they were not allowed to

6    reopen the hearing after concerns about their lot coverage and

7    insufficient open space were raised.

8              So the council raised these issues after the hearing

9    and didn't allow the Clarks to reopen the hearing and so

10   determined that they did not have a fair trial.

11             But in Claxton there were several hearings before his

12   application was denied, and letters back and forth.  And

13   Claxton had an attorney, and he and his attorney were given

14   ample time to address concerns.  They worked on this for a long

15   time.

16             THE COURT:  Okay.  And final prong, from the

17   plaintiff's standpoint.  Was there a prejudicial abuse of

18   discretion?

19             MS. UEDA:  Yes, Your Honor.  And I think we touched

20   on that earlier in terms of how the County abused its

21   discretion.  And the County really abused its discretion a

22   number of ways.  First in deeming the application incomplete

23   from the outset.  That was in violation of the Permit

24   Streamlining Act.  The application clearly was complete when it

25   was submitted.  Secondly, in adopting the resolution that

1    effectively amended the general plan.  And thirdly, Your Honor,

2    the board of supervisors fundamentally lacked any substantial

3    evidence to make its finding.

4         The board really didn't have any specific evidence in

5    front of it, much less substantial evidence, to make the four

6    findings that were eventually made by both the planning

7    commission and the board of supervisors.

8         The finding primarily dealt with the issue of using

9    the land for a purpose that was going to be non-agricultural in

10   their mind and the prevalence of non-farming families, none of

11   which was ever brought to the board's attention as something

12   that could -- would actually happen.  It was a merely a

13   hypothetical concept in the board's mind.

14        And so Your Honor, we submit that under Section

15   1094.5 a writ should issue because really all of the different

16   standards under 1094.5 we've satisfied.

17             THE COURT:  Response.

18             MS. STRINGER:  Yes, Your Honor.  I think if you look

19   at the two major board hearings, you will see that Mr. Claxton

20   had a very fair trial.  He was represented.  And all his

21   concerns were addressed, and there was even at least one member

22   of the board of supervisors -- and I believe they cited that --

23   and I think there was another who brought up questions of why

24   are we doing this, what are we doing, is this unfair to him or

25   not.

1          But the result was a unanimous decision by the board

2     based on everything that it had heard, and it had heard a lot.

3     We've got 700 pages here of what went on with Mr. Claxton's

4     application.

5          And if I could just go back for a second to this

6     agricultural/non-agricultural use.  If you took a snapshot in

7     time of Mr. Claxton's land, if he got his application, you

8     would see 37 10-acre lots, and there would be orchards on them.

9     But it's what's going to happen to them afterwards that was the

10    concern.  Were they going to remain agricultural?

11         And the County was seeing that more likely than not

12    they weren't.  At least the potential was certainly there, and

13    it was a very real potential.

14         THE COURT:  When you say they weren't going to remain

15    agricultural, are you saying that they could become

16    dilapidated, or that they would be put to a different use?

17    Because it's clear from the general plan that this is

18    agricultural land, and I think that what your concern is that

19    -- because, quite frankly, Mr. Claxton or whoever else is

20    owning land there could understand that it's agricultural zone

21    and part of the general plan, but decide I'm going to cut every

22    tree down, every orchard, and just let it sit there.

23         MS. STRINGER:  Precisely.  And what happens as a

24    practical matter is if you have 400 acres, you've got

25    individuals living on them, 10-acre lots, and most of them let

1    their trees go, and people come in and say, well, this isn't

2    agriculture anymore de facto, so we're going to change the

3    zoning.

4           THE COURT:  Let's say they don't build houses.  He

5    just cuts everything down, take it to dirt, all the way across,

6    420 acres, dirt.

7           MS. STRINGER:  Well, you would have dirt, but you

8    wouldn't have houses, if that's what you're talking about.

9           THE COURT:  Where do you know and assume that there

10   are going to be houses?

11          MS. STRINGER:  Because there would be -- what you are

12   watching is you are dividing into 10-acre lots so that people

13   will come in and buy them.  They will not buy often 20- or

14   40-acre lots because it's very expensive to run agricultural,

15   especially a walnut or almond orchard.  But the 10-acre lots,

16   as mentioned in the hearings, are going to people who want

17   little ranchettes.  They would like to have acreage, and they

18   think the idea of an orchard is great until they have to

19   maintain it.  Then they let it go.

20          THE COURT:  But that could be for 10 acres, 20 acres,

21   50 acres, or 100 acres.  People have great ideas about being

22   the great farmer or rancher and doing all these things, and

23   they find out there's more to it than what they thought, and it

24   goes sideways.

25          MS. STRINGER:  Of course.  That's what the County is

1    trying to do.  It cannot prevent everything.  There is just no

2    way that any municipality can deal with every eventuality.

3    What it tries to do is maximize the potential for living within

4    the intent of its general plan.

5            THE COURT:  Correct.  So if that were the case, then

6    I go back to one of my original questions then.  Isn't there

7    some way that the County could use its zoning and enforcement

8    powers to maintain certain levels of agriculture or certain

9    levels of upkeep, if you will, to satisfy that?  Because that's

10   the issue that you are talking about is someone letting

11   something just fall apart.

12           MS. STRINGER:  I mean --

13           THE COURT:  Not the fact of what they are doing, what

14   they wanted to do, but that they just aren't doing it.  It's

15   like any zoning ordinance that you have in any city, any urban

16   setting, we have certain enforcement methodologies that can be

17   used to enforce that.

18           And it seems that's what the County is trying to get

19   to is to try to make sure that people don't get themselves

20   involved in something that they really shouldn't be doing, or,

21   if they do get involved, that you make sure that you don't

22   allow it to become overrun with weeds, your trees don't die, or

23   I think I read put vehicles on the property, storage, junk,

24   other things such as that.  I'm sure there are some ordinances

25   that could be enforced to require any type of junk vehicles or

1    anything else that's there to be removed.

2           MS. STRINGER:  Are there other things the County can

3    do?  I'm sure there are.  But that's not the situation we're

4    dealing with.  We're dealing with a situation that it was faced

5    with not only with Mr. Claxton's application but a number of

6    applications.  And could in the future they try to do something

7    with zoning?  Perhaps.  But it is an abuse of discretion to

8    deal with it the way they did?  No.

9           THE COURT:  That's what I'm going to focus on because

10   that's the issue, whether this resolution was a de facto

11   modification of the general plan.  And if it's a modification

12   of the general plan, then it wasn't done with the appropriate

13   requirements under the state law, if that's what it is.  And if

14   that's the case, then it probably tips in favor of the

15   plaintiff for the writ.

16          On the other hand, if it's not a de facto

17   modification of the general plan, as the County is arguing,

18   it's within their discretion.

19          It looks that way.  And that's where I think is going

20   to be the main focus of this whole issue of a writ.  It's going

21   to come down to that right there.

22          MS. UEDA:  Your Honor, and I would just submit again

23   that effectively what the County did was to amend its general

24   plan without following the procedures.  I think, as Your Honor

25   made clear as you were going through the language in the

1    general plan, the language says that agriculture and general

2    areas are subject to a 10-acre minimum lot size requirement.

3    There is nothing in the general plan that speaks to the 20-acre

4    minimums or to the subdivision of land into parcels of 20 acres

5    or less when there are five or more parcels being subdivided.

6    There is just nothing in there.

7            What Mr. Claxton submitted was in compliance with and

8    consistent with the general plan upon submission.

9            And Your Honor, the other thing, though, that we

10   haven't talked as much about is the substantial evidence that

11   was before the board of supervisors and in front of the

12   planning commission as well.  And the County keeps coming up

13   with these hypotheticals and these fears that they have about

14   the use of the land.  They may have these fears about the

15   continued viability of the land in the County for agricultural

16   use, and they undoubtedly do, but the remedy for that isn't for

17   them to have adopted this resolution.

18           The remedy was to have actually amended those

19   documents, the general plan and the zoning ordinance.  There

20   are things that they can do to prevent the type of decay or the

21   lack of agricultural production that they are concerned about.

22           I mean, that's why fundamentally cities and counties

23   have nuisance ordinances.  That's why they have the police

24   power to regulate in those areas, to keep the community looking

25   like the way they want it to look.  To have an attractive

1    community they have the ability to regulate for public health

2    and safety.

3            And it wasn't like these documents exist in a vacuum.

4    They are the legislative body that has the opportunity and the

5    chance.  They are the only ones that can amend them.  But if

6    they do so, they have to amend them in the proper way and

7    following the proper procedures, and in a manner that gives

8    notice to the affected public, and isn't rushed through at the

9    last minute without any public hearing, public notice, or any

10   planning commission recommendation.

11           And getting back to the substantial evidence issue

12   and this particular piece of property that was before them,

13   Mr. Claxton stated numerous times that all he was trying to do

14   was to change the size of the parcels and not to change the

15   use.  He told the board of supervisors that he had been farming

16   the property for about six years, and he told the County that

17   he was making improvements on the property for farming

18   purposes.  He was actually buying new equipment for the

19   property, so it can continue in orchard use, and stated very

20   clearly to the County that his intent was to farm the property.

21           And looking at the weight of the evidence in the

22   administrative record, it just came down to the County's

23   belief, based on whatever beliefs it may have had, maybe what

24   it was seeing around it as the County had alluded to, that

25   Mr. Claxton was not going to farm the property despite all of

1    his numerous statements in the record that he was going to.

2    And he was not seeking, again, any change in the use of the

3    property.

4           THE COURT:  All right.  Do you wish to finish up?  I

5    think I understand your position there.

6           MS. STRINGER:  I think so.  Yes.  Substantial

7    evidence.  I think it's obvious from what was before the board

8    that there was a lot of evidence before the board.  And the

9    County did what it was supposed to do.  It was supposed to take

10   a look at conflicting evidence and make a decision based on the

11   intent of its general plan, and that's why it adopted the

12   resolution because it was faced with increasing requests for

13   these huge lot splits.

14          Mr. Claxton could have had his four lots split with a

15   remainder.  He didn't want it.  You are allowed to take a look

16   and say why would that be, and he said he was going to sell off

17   lots if financing became a problem.  If he was going to farm

18   the land as a whole, why split it?  Especially if he could have

19   had his four-acre split without any difficulty.  That's all.

20          THE COURT:  I understand.  And in a lot of ways this

21   can be looked at and analyzed, even taking Mr. Claxton or this

22   whole issue out, and not making it a personal issue, you can

23   still go into what was the modification that was done by that

24   resolution.  Does it affect the general plan regardless if

25   there was anyone out there or not?

1      It could have been just that one day the board of

2   supervisors, the planning council came and said, you know,

3   we've got to do something about this proactively.  We don't

4   have any applications pending, but in the event we do, we need

5   to do something about this.  And if that's the case, without

6   putting anyone in here personally, without putting any

7   statements, or who said what, or what the intent was, or what

8   happened in the past, but just looking at it strictly from the

9   standpoint of, did the county have the power to do what it did,

10   and if so, did it do it in accordance with the law.  That's the

11   real gist of this right now.

12      I'm going to take this matter under submission.

13   Counsel, expect a decision within seven to ten days through the

14   electronic filing system.  Thank you very much.  Very well

15   briefed, very well argued case today.  Thank you very much.

16   Court's adjourned.

17      (11:32 a.m.)

18                     CERTIFICATION

19      I, Diane J. Shepard, certify that the foregoing is a

20   correct transcript from the record of proceedings in the

21   above-entitled matter.

22

23                      /s/ DIANE J. SHEPARD
                         DIANE J. SHEPARD, CSR #6331, RPR
24                      Official Court Reporter
                         United States District Court

25

DIANE J. SHEPARD, OFFICIAL COURT REPORTER, USDC -- (916) 554-7460